822 F.2d 469
 125 L.R.R.M. (BNA) 3292, 107 Lab.Cas. P 10,018
 Arnold ROBINETTE, individually and on behalf of others
similarly situated, Plaintiff-Appellant,
v.
INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN AND HELPERS OF AMERICA, LOCAL NO. 29,
Defendant-Appellee.
 No. 86-2166.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 9, 1987.
Decided July 7, 1987.
 
 Arthur Lowell Fox, II (Alan B. Morrison, Edward L. Hogshire, Buck, Hogshire & Gouldman on brief), for plaintiff-appellant.
 Donald Lawrence Havermann (Charles P. O'Connor, Morgan, Lewis & Bockius on brief), for defendant-appellee.
 Before HALL, SPROUSE, and WILKINSON, Circuit Judges.
 SPROUSE, Circuit Judge:
 
 
 1
 Arnold M. Robinette, a truck driver employed by Smith's Transfer Corporation at its Staunton, Virginia, terminal, appeals from the district court's dismissal of his claim against the company. Robinette commenced this action after he was laid off in 1981. He claimed his layoff violated an agreement by Smith's not to reduce its Staunton workforce after opening new terminal facilities at other locations.[1] According to Robinette, the opening of the new facilities was conditioned on a "change of operations" order[2] that incorporated Smith's agreement to maintain the employment of its Staunton-based truck drivers. The district court held that Smith's alleged agreement did not restrict its right to lay off truck drivers at the Staunton terminal. We affirm.
 
 
 2
 Prior to the 1970s, Smith's operated as a regional freight carrier, servicing primarily the Maryland, Virginia, and West Virginia areas. By the mid-1970s, however, Smith's operations had expanded to the Midwest and Northeast sections of the United States. In 1976, Smith's built new facilities in Columbus, Ohio, and Carlisle, Pennsylvania, to handle the increase in freight traffic.
 
 
 3
 The operation of the new facilities involved a restructuring of Smith's transportation system and a potential redeployment of truck drivers. Pursuant to provisions in the master collective bargaining agreements[3] that governed its employees' seniority rights, Smith's was required to submit a proposal outlining its planned change of operations for approval by a joint grievance-arbitration panel known as a "Change of Operations Committee." The purpose of the Committee, as defined in the master agreements, was to protect the seniority rights of employees "affected" by a proposed change of operations. Article 8, Section 6, of the 1976-79 agreement provided in pertinent part:
 
 
 4
 Present terminals, breaking points or domiciles shall not be transferred or changed without the approval of an appropriate Change of Operations Committee. Such Committee shall be appointed in each of the Conference Areas, equally composed of Employer and Union representatives. The Change of Operations Committee shall have the authority to determine the seniority of the employees affected and such determination shall be final and binding.
 
 
 5
 The remainder of Section 6 included a lengthy description of seniority rules applicable to changes in the employer's operations. Section 6(d)(3) required Smith's when instituting operational changes to offer "affected" employees the opportunity to "bid" in order of seniority on driving positions at the newly established facilities.[4] Section 6(a) of the agreement conferred on "affected" employees the right to appear before the Change of Operations Committee within twelve months after its approval of a change of operations "to consider the redomicile of employees who are laid off as a direct result of [the] opening of [the] new terminal." Finally, the Committee was to "observe [Smith's] right to designate home domiciles and the operational requirements of the business" when considering the transfer of drivers affected by a change of operations.
 
 
 6
 In March 1977, Smith's submitted a written proposal to open its new Columbus and Carlisle terminals to the appropriate Change of Operations Committee. The proposal stated:
 
 
 7
 The Company's present breakbulk facilities are at or exceed physical capacity. Due to the geographic locations of the existing breakbulk centers, a high percentage of the traffic is moving in a circuitous manner, creating higher costs, poor utilization of manpower and equipment and rendering unsatisfactory service.
 
 
 8
 With the Company's growth history, it is the intent to offer all present employees work opportunity as long as business is maintained at present or higher levels.
 
 
 9
 In addition, Smith's proposal discussed the work opportunities of employee's "affected" by the change of operations, projecting that:
 
 
 10
 Under present business conditions, the road driver compliment [sic] at ... Staunton will remain at present levels. We project our needs for road drivers to be 160 at Columbus and 50 at Carlisle to start. It is our intention to continue hiring at ... Staunton.... The number hired ... on or after March 1, 1977, will be the number of work opportunities affected and will be offered transfer to Columbus and Carlisle.
 
 
 11
 The Change of Operations Committee met in March 1977 to review Smith's proposal. The Union representatives expressed concern that the existing workforce might be reduced if the proposal was implemented. Smith's representative stated that "as long as business continues at present or higher levels [we can assure you] that your people will be protected." The Committee approved Smith's proposal by a unanimous vote.
 
 
 12
 Thereafter, the Carlisle and Columbus terminals were opened, and Smith's proposal effectuated. Staunton-based drivers were permitted to bid on driving positions out of the new terminals. Fifteen exercised their contractual rights to bid on the new positions. Neither Robinette nor any of the other putative class members that were laid off between 1979 and 1981, however, submitted bids to transfer to Carlisle or Columbus.
 
 
 13
 Smith's business continued to prosper after the opening of the new terminals. As it had projected, Smith's hired additional truck drivers at its Staunton terminal during 1977, 1978, and the first half of 1979. Beginning in mid-1979, however, the company laid off drivers domiciled at Staunton.[5] As a result of the layoffs, which ultimately included Robinette, a group of eighty-five Staunton drivers filed a grievance alleging that Smith's had violated the terms of its 1977 Change of Operations proposal to the Committee. After a grievance panel denied the employees' grievance, Robinette filed this action in federal district court.
 
 
 14
 In his complaint, Robinette alleges that Smith's commitment to maintain a full complement of truck drivers at its Staunton facility was central to the Change of Operations Committee's 1977 approval of the Carlisle and Columbus facilities. He claims that by reducing its Staunton workforce, Smith's violated the Committee's order and the master agreements. The district court held that, notwithstanding Smith's projections for future employment at the Staunton terminal, its statement to the Committee did not amount to a promise not to reduce its driver force and that the Committee could not have imposed that condition. According to the court, such a modification would constitute an unauthorized amendment by the Committee to the master agreements. It therefore dismissed Robinette's action against Smith.[6]
 
 
 15
 Robinette, on appeal, contends that by increasing the work routed to the new terminals after 1979, while laying off employees at the Staunton terminal, Smith's implemented a de facto change of operations that was not approved as required in the master agreements. He asserts that until Smith's obtained approval for its "new" operations, it was obligated to maintain the number of drivers at the Staunton facility that were domiciled there in 1977. We disagree. Smith's unilateral personnel projections granted the Committee no authority to limit Smith's rights to lay off drivers in 1979.[7] The master collective bargaining agreements limited the Committee's jurisdiction principally to questions of seniority arising out of proposed changes of operations. At most, the Committee's authority "to consider the redomicile of employees who are laid off as a direct result of [the] opening of [the] new terminal" extended for only twelve months after a change of operations had been approved. There is no question here that Smith's complied with its proposed operations plan for well over twelve months after the new terminals were approved. Assuming arguendo that the Committee retained some remedial jurisdiction to monitor Smith's management practices, it possessed no authority to restrict Smith's prerogative to structure its workforce more than one year after it approved the 1977 change of operations.
 
 
 16
 In view of the above, the judgment of the district court is affirmed.
 
 
 17
 AFFIRMED.
 
 
 
 [1]
 Robinette filed his complaint in federal court as class representative for a putative class composed of truck drivers that had been laid off from Smith's Staunton facility between 1979 and 1981
 
 
 [2]
 A "change of operations" is a procedure for opening new terminals that is defined in the collective bargaining agreements governing this dispute
 
 
 [3]
 The 1976-79 and 1979-82 "National Master Freight Agreements" between Smith's and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local No. 29
 
 
 [4]
 Section 6(d)(3) provided in pertinent part: "[w]hen a new terminal(s) is opened ... the Employer shall offer those employees, if any, affected thereby the opportunity to transfer to regular positions in the new terminal(s) in the order of such employee's continuous classification ... seniority date as defined herein."
 
 
 [5]
 The underlying reason for the layoffs is in dispute. Smith's maintains that they were caused by various external forces, including deregulation and economic recession. Robinette argues that the layoffs were part of a calculated effort by Smith's to reroute Staunton-based work to newly hired drivers at the Carlisle and Columbus terminals, thereby resulting in substantial savings to the Company in the form of reduced pay rates and lower fringe benefits. As discussed below, however, resolution of this factual dispute is not necessary to the outcome of this case
 
 
 [6]
 Robinette also brought a claim against Teamsters Local 29 for breach of its duty of fair representation. That claim was not dismissed by the district court, and has since been settled
 
 
 [7]
 Contrary to Robinette's contentions, we cannot say that the district court's finding that Smith's projections amounted to no more than a statement of present intention was clearly erroneous. The projections certainly did not constitute a private contractual "amendment" to the master agreement then in force